49 F.3d 1490
 67 Fair Empl.Prac.Cas. (BNA) 844,
67 Empl. Prac. Dec. P 43,802
Kara CROSS; Debra York, Plaintiffs-Appellees,
Martha O'Quinn; Melissa Weltin; Mary Stalnacher; Secunda
Davis; Carolyn Thacker, Plaintiffs-Intervenors-Appellees,
v.
STATE OF ALABAMA, STATE DEPARTMENT OF MENTAL HEALTH & MENTAL
RETARDATION; J. Michael Horsley, individually and as
Associate Commissioner for the State Department of Mental
Health & Mental Retardation; R. Emmett Poundstone, III,
individually and as Associate Commissioner for the State
Department of Mental Health & Mental Retardation; Larry
Stricklin, individually and as Facility Director of the
Taylor Hardin Secure Medical Facility, Defendants-Appellants.
 No. 92-7005.
 United States Court of Appeals,
Eleventh Circuit.
 April 6, 1995.
 
 Peyton Lacy, Jr., James C. Pennington, Robin W. Andrews, Birmingham, AL, for J. Michael Horsley.
 Robert S. Vance, Jr., Edward E. May, Birmingham, AL, for R. Emmett Poundstone, III & Larry Stricklin, individual capacity.
 G.R. Trawick, Montgomery, AL, for State of Ala., R. Emmett Poundstone, III & Larry Stricklin, official capacity.
 John C. Falkenberry, Fern Singer, Birmingham, AL, for appellees.
 Appeal from the United States District Court for the Northern District of Alabama.
 ON PETITION FOR REHEARING
 Before HATCHETT and COX, Circuit Judges, and RONEY, Senior Circuit Judge.
 HATCHETT, Circuit Judge:
 
 
 1
 In this hostile environment sexual harassment lawsuit, we affirm the district court in part and reverse the district court in part, including its retroactive application of the Civil Rights Act of 1991.
 
 FACTS
 
 2
 The Alabama State Department of Mental Health and Mental Retardation is the agency responsible for maintaining and operating various mental health facilities throughout the state. The Taylor Hardin Secure Medical Facility (Taylor Hardin) in Tuscaloosa, Alabama, is one such facility within the Department. Taylor Hardin is a forensic facility which provides psychiatric services, primarily serving patients from the state criminal system.
 
 
 3
 The appellees, plaintiffs in the district court, are past or present female employees at Taylor Hardin. The appellants, defendants in the district court, are as follows: the state of Alabama; J. Michael Horsley, individually and in his official capacity as Commissioner of the Alabama Department of Mental Health and Mental Retardation (Department); R. Emmett Poundstone, III, individually and in his official capacity as Associate Commissioner for the mental illness division of the Department; and Larry Stricklin, individually and in his official capacity as director of the Taylor Hardin facility. From November, 1988, through May, 1991, Horsley was commissioner of the Department and responsible for about 7,000 state employees. Poundstone was Stricklin's immediate supervisor since 1988. Stricklin was the director at Taylor Hardin since Taylor Hardin first opened in 1981.
 
 Testimony at Trial
 
 4
 (1) Parties to the legal action
 
 Dr. Kara Cross
 
 5
 Dr. Kara Cross is a licensed clinical psychologist, and she was director of intermediate care at Taylor Hardin from September 24, 1990, until August 15, 1991. Cross reported to Assistant Facilities Director John Donahue, and at times, directly to Stricklin. Cross testified that Stricklin's
 
 
 6
 manner of communications with other women was extremely hostile, very angry, very aggressive. That he was demeaning to them.... He would not allow them to speak freely and openly. That he would say derogatory remarks to them in front of others. And that was humiliating to them. And over a repetition of time that those women became extremely fearful and preferred not to be in his presence.
 
 
 7
 Cross testified that Stricklin threw objects, including pencils, at female employees. On one occasion when Cross questioned standard treatment at Taylor Hardin, Stricklin became very angry and stated that employees, particularly female employees, "must prove to him that they were not incompetent and they were not inadequate before he would accept the fact that they were." Cross testified that upon hearing this she felt "insulted," "extremely frustrated," "nervous," and a "high level of stress."
 
 
 8
 Cross testified that after Stricklin seemed to make passes at her, which included hugs, winks, and stroking of Cross's hand, Stricklin became more hostile and aggressive towards her. The frequency of yelling, screaming, pounding on the desk, name calling, finger pointing, and getting within eighteen inches of Cross's face increased. Cross testified that she never witnessed Stricklin raise his voice at male employees. Cross also indicated that Donahue told her that he realized Stricklin was a tough individual and "was tougher on women than he was on men."
 
 
 9
 Cross testified that after March, 1991, when she and others met with Donahue concerning Stricklin, her meetings with Stricklin increased. Cross met with Stricklin two to three times a week, and those meetings lasted from two to nine hours. The meetings consisted of Stricklin "ranting, raging, yelling." Cross was "extremely fearful, anxious, frustrated, at times tearful." "Physically [she] had constant headaches, stomach aches. [She] was not sleeping. [She] was not eating. [She] would be in a constant state of anxiety, shaking, sweaty palms." When Cross left work she "would usually be in a state of severe stress and depression." Eventually, Stricklin's behavior forced Cross to seek psychiatric help to overcome her depression and anxiety.
 
 
 10
 Cross resigned on August 15, 1991, as a result of Stricklin's behavior toward her. At trial, Cross read her resignation letter, which stated in part that
 
 
 11
 this unwarranted action [of severely disciplining me], coupled with the daily harassment I endure makes it impossible for me to successfully complete my responsibilities. No reasonable person could be expected to perform satisfactorily given the daily obstacles that I must confront.
 
 Deborah York
 
 12
 Deborah York was manager of human resource development at Taylor Hardin, and began work in August, 1981. York testified that she witnessed Stricklin make derogatory comments to women in general as a class, including "women belonged barefoot and pregnant." York also testified that Stricklin constantly belittled and yelled at females, but never at a male. York stated that Stricklin threw things at her and once threw a lit cigarette at her, ruining her wool skirt.
 
 
 13
 York testified to a meeting involving Joe Long (York's direct supervisor), Stricklin, and herself. Stricklin was very angry and hostile, glared at her, pounded on the desk, and pointed his finger at her. Stricklin did not treat Long in the same fashion, but merely asked an occasional question of Long. York testified that she was humiliated and very upset.
 
 
 14
 At a January, 1988, meeting with Stricklin, Stricklin inquired whether York was recruiting staff to go to the Commissioner about him. York indicated that Stricklin then began attacking her work performance, though she felt she was doing a good job. York testified that Stricklin was very hostile at this meeting, making "glaring looks, piercing looks." At one point in the meeting, Stricklin pounded on the desk and gave York "an administrative order to tell him who [York] talked with." York then provided Stricklin with the names of those with whom she had discussed reporting Stricklin's conduct to the Commissioner. Then, before York left for the day, Stricklin called her into his office, stated that he heard some distressing news and that he was going to "have to ask for [York's] resignation."
 
 
 15
 Stricklin told York that the distressing news was that Poundstone had told Stricklin about complaints staff had made to him about his conduct. York testified at this point she felt "severe anxiety" and was "fearful for [her] livelihood." The next day, Long told York that Stricklin spoke to his superiors in Montgomery, Alabama, who told Stricklin "he could not do anything to [York] because [York] had a perfect work record." York testified that it was after these events that she and her attorney met with Commissioner McFarland.
 
 
 16
 York retained counsel due to the fear of losing her job, and in early 1988, met with then Commissioner McFarland and complained about Stricklin's conduct towards her. McFarland responded that he received "similar complaints" from other people concerning Stricklin's conduct.
 
 
 17
 York testified that Poundstone requested York to meet with him in late spring, 1988. York told Poundstone about staff members' complaints concerning Stricklin's conduct. Poundstone considered the documents York received from Stricklin to be "harassing memos." York also testified to a letter of acknowledgement from Poundstone, admitted into evidence, thanking York for the materials sent to Poundstone concerning Stricklin's conduct. Poundstone later told York that he received "similar complaints" about Stricklin. York indicated that she informed Poundstone that Stricklin treated female employees differently than male employees and, in fact, told Poundstone that Stricklin stated "women should be barefoot and pregnant."
 
 
 18
 York thereafter spoke with Poundstone concerning an investigation Richard Koerner, director of investigation with the Department, was directing involving Stricklin's alleged discriminatory treatment. York testified that in the fall of 1989 she met with Poundstone who told her that "he wanted to get rid of Larry Stricklin." According to York, Poundstone expressed his opinion that "Stricklin had a problem with women." Then, in the fall of 1990, Poundstone told York that Horsley told him not to do anything "because Taylor Hardin as a facility was respected nationwide for the type facility that [it was]. And just to leave it alone. And that if Mr. Stricklin messed up later on, they would deal with it then."
 
 
 19
 York testified that upon Poundstone's notifying her that he was not to take any immediate action against Stricklin, she "was scared to death." York indicated that she then took a leave of absence in July of 1991 because she "was afraid of retaliation from the lawsuit" and "was having nightmares."
 
 
 20
 York testified to plaintiff's exhibit number 9, a letter dated January 16, 1990, from York to Poundstone indicating that at least ten female nurses
 
 
 21
 have either given notice or requested permission to transfer [from Taylor Hardin]. They want to leave before their personal files and nursing careers are ruined, the nineteen disciplinary actions taken before Christmas and because of the way Larry [Stricklin] talked to them and the assistant director of nursing at the nursing Christmas party.
 
 
 22
 The document also indicates that staff members were afraid to talk and state the truth in the upcoming "disincentive survey" based upon what would be done "by [Stricklin's] boys from Montgomery and that it won't be confidential. They also feel that even if they do talk nothing will be done to Larry...."
 
 
 23
 York also testified to plaintiff's exhibit number 10, a letter dated February 7, 1991, from York to Poundstone further indicating Stricklin's "hostile," "intimidating," abusive and harassing conduct towards female employees. The document states that several female employees had either resigned or were considering transferring from Taylor Hardin.
 
 
 24
 York was on leave for approximately seven weeks and upon her return, she found a live microphone in her work area. York testified that she had no knowledge whether Stricklin directed anyone to listen in or record any of her conversations.
 
 Carolyn Thacker
 
 25
 Carolyn Thacker worked at Taylor Hardin from July 6, 1989, to August 15, 1991, as medical records technician. According to Thacker, Stricklin belittled women and treated women differently than men. Thacker testified she never observed Stricklin express his anger towards a male employee the way he did with female employees. At meetings Stricklin paced around the room, and glared and yelled at female employees. Thacker said Stricklin attempted to "belittle us. Tried to make us look like we were stupid, like we didn't know what we were doing." Thacker became scared of Stricklin because she did not know what he would do.
 
 
 26
 Thacker resigned on August 1, 1991, because she "could no longer take the abuse, the verbal abuse, the angry outbursts. I was terrified every day I went into work.... I was sick. I couldn't sleep, and I couldn't take it any longer." She did not file a complaint because she "was terrified, and I needed a job. I had no other means of support. And I needed to work."
 
 Mary Stalnacher
 
 27
 Mary Stalnacher is a registered nurse and, at the time of trial, had been for thirty-five years. Stalnacher began work at Taylor Hardin on February 15, 1988, as director of nursing service. Stalnacher had regular contact with Stricklin and supervised a staff of approximately 100.
 
 
 28
 Stalnacher testified that Stricklin on occasion called her into his office and screamed at her, for no reason that she could discern. Stalnacher also testified that at staff meetings, Stricklin told sexual and dirty jokes she found offensive. On one occasion, Stricklin called one particular female employee, Jacky Doss, a "fat butt as she was walking down the hall."
 
 
 29
 On numerous occasions Stalnacher witnessed Stricklin get angry at female employees and get right in their faces and point at them. Stricklin did not do this with male employees. Many women felt a high level of stress at Taylor Hardin because of Stricklin's conduct. Stricklin made "disparaging comments to [women] as a group," and labeled women as "rather dumb," "stupid," or "just a woman." Stricklin called Stalnacher's work station at times, stating that "I upset your secretary, and she is crying." Stalnacher testified that this happened on many occasions, every time her secretary went to see Stricklin.
 
 
 30
 On one occasion, Stalnacher was in Stricklin's office while Stricklin talked with Poundstone on the telephone. Stricklin relayed to her that employees complained about Stricklin's conduct to Poundstone. Stalnacher testified that this made her believe that if she attempted to file a complaint to anybody, it would have to be the governor. Stalnacher resigned on February 18, 1990, and testified she "could not work with Mr. Stricklin any longer." She did not list the real reason on the resignation notice because she needed another job.
 
 Secunda Davis
 
 31
 Secunda Davis is a registered nurse and, at the time of trial, had been for twelve years. Davis began employment at Taylor Hardin in June, 1986. According to Davis, Stricklin "was harsh to nurses. He put them down a lot." Davis testified that Stricklin treated women harsher than men with respect to discipline. Stricklin intimidated her "by passing in the room and walk[ing] real close to [Davis's] chair." Stricklin made her feel very uncomfortable through yelling and glaring at her, and putting her down. Davis testified that Stricklin got angry and lost his temper with her on several occasions. She felt that Stricklin might strike her in anger at any time.
 
 
 32
 Davis testified to a nurses' meeting held in December, 1990, involving thirty-five nurses (two of them male nurses) and Stricklin. According to Davis, Stricklin acted as if
 
 
 33
 he didn't think what we were saying was important. He had to elicit some kind of response from one of the males. If they [male nurses] were sitting in a corner and didn't say anything, it was, oh, come on now, Terry [a male nurse], come on now, you can say something. You're gonna let all these women just sit here and do all the talking? Don't you have something to say? Come on now.
 
 
 34
 Davis testified that Stricklin made comments that mistakes would not happen if males were in the positions of decision-making.
 
 
 35
 Davis testified to Stricklin's offensive touching of her. She testified that this was the beginning of all her problems at Taylor Hardin. When Davis became shift supervisor, Stricklin came down the hall and began reviewing memos with her in the hallway. While standing with Davis, Stricklin got very close and put his arm around Davis. Staff members witnessed this, knowing that Davis was married. According to Davis, from that point on, everything she did "was poor in his opinion."
 
 Martha O'Quinn
 
 36
 Martha O'Quinn joined the staff at Taylor Hardin in June, 1990, as recreational director. O'Quinn resigned in March, 1991, stating that "I wanted to get out of there before my life was wrecked, before my career was wrecked." The reason O'Quinn did not file a complaint against Stricklin was because she was afraid, and fellow employees told her that Stricklin's supervisors (Horsley and Poundstone) were friends with Stricklin.
 
 
 37
 O'Quinn testified that Stricklin treated male employees differently than female employees. "He was very, uh, very professional with the men, ... the way I would have liked to have been treated." At the meetings she attended, Stricklin "would pace around us like we were caged animals." Stricklin used the "good old boy thing" technique when dealing with male employees, "and then, you know, it's like he changed when he was talking to women." These meetings made O'Quinn feel incompetent. Stricklin threw things at her, and at one of the staff meetings, Stricklin referred to Kara Cross as she walked across the room, stating "well, I guess women are taking over things."Melissa Weltin
 
 
 38
 Melissa Weltin began work at Taylor Hardin in July, 1990, as medical records director, and resigned in May, 1991. Weltin testified that each morning at staff meetings, Stricklin "always pick[ed] at something I said. And he would talk to me in a sarcastic manner. And I would feel belittled by him." Stricklin "would sit in the morning meetings and glare at me. I never received such cold, calculating, glaring stares." Weltin testified that Stricklin treated female employees differently than male employees. Stricklin made sarcastic comments towards her and yelled at her, making her cry. Weltin never witnessed Stricklin yell at male employees.
 
 
 39
 In the fall of 1990, Stricklin called Weltin into his office quite often and yelled at her. Weltin left Stricklin's office crying on several occasions, and witnessed other women coming out of his office in tears on several occasions. Stricklin made comments about women, including calling a specific female employee a "butt head" and a "cow" in the woman's presence.
 
 
 40
 Weltin testified that on the evening before she resigned, Stricklin called her into his office and proceeded to disparage her work. Weltin submitted her resignation letter the next morning. At a meeting that afternoon, Weltin informed Stricklin that she had resigned. He responded, "Yes, I do know that." According to Weltin, Stricklin then stood up, pointed his finger at her, and began yelling at her.
 
 James Michael Horsley
 
 41
 At the time James Michael Horsley testified, he was CEO of the Alabama Hospital Association. Prior to June 1, 1991, Horsley was commissioner of the Department beginning in November of 1988. Horsley testified that as commissioner, he did not receive any complaint of sexual harassment from any of the appellees nor any employee at Taylor Hardin. Horsley testified that he and Poundstone never discussed sexual harassment at Taylor Hardin, but did discuss Stricklin's "management by intimidation" style. Horsley testified that he never had any "indication of Larry Stricklin treating women differently from men."
 
 Robert Emmett Poundstone, III
 
 42
 At the time of R. Emmett Poundstone's testimony he was associate commissioner for the mental illness division, beginning November of 1988. Poundstone testified that prior to this lawsuit, no employee at Taylor Hardin filed a complaint alleging sex discrimination or harassment. Poundstone stated that the only employees from Taylor Hardin "who ever complained to [him] about problems about Mr. Stricklin have been women." Poundstone described Stricklin's management style as "very tough."
 
 
 43
 Poundstone testified that when he discussed Stricklin's behavior with York, he inquired whether Stricklin sexually harassed her. Poundstone stated that York replied, "No." Poundstone testified that Koerner's investigation failed to give him the idea that sexual harassment existed at Taylor Hardin. Poundstone testified that none of the appellees made any allegations of sexual harassment to him.
 
 
 44
 Poundstone testified that neither the disincentive surveys nor comments following the surveys revealed any suggestion of sexual harassment or discrimination to him. Poundstone acknowledged that both surveys revealed that employees at Taylor Hardin were "afraid to voice opinions," "management still loses temper too often" and the "director intimidates and threatens."
 
 
 45
 On cross-examination, Poundstone indicated that the second disincentive survey number 36 revealed that an employee commented that Stricklin "talks down to people, especially women." Poundstone acknowledges that he did nothing in response to this comment. Poundstone testified that the second disincentive survey summary read that the "director is still yelling, screaming, finger pointing, intimidating, and belittling staff," and that the "director continues to treat all levels of staff in a degrading and abusive nature." Poundstone testified that these remarks were reported in both disincentive surveys.
 
 Larry D. Stricklin
 
 46
 At the time of trial, Larry Stricklin maintained his position as director at Taylor Hardin. Stricklin denied any discriminatory treatment towards female employees. Stricklin acknowledged witnessing female employees "running out of [his office in] tears or walking rapidly, leaving [his] office quickly in tears."
 
 
 47
 Stricklin denied getting angry at employees often, and testified that in the eleven years at Taylor Hardin he became angry at an employee no more than "more or less" five times. Stricklin's attorney asked him what Stricklin is like when he is angry. Stricklin responded that "[w]hen I really get angry, I withdraw. I don't--I don't go screaming and yelling at staff. Now if I'm aggravated, yes. I may raise my voice. I become intense. But it doesn't mean I'm angry at the person."
 
 
 48
 Stricklin testified that he instructed an employee to remove the microphone in York's work area. Stricklin testified that he never monitored conversations in York's work area nor instructed anyone to listen in on York's conversations via the microphone.
 
 
 49
 (2) Non-parties to the legal action
 
 Joanne Terrell
 
 50
 Joanne Terrell was director of rehabilitation services and social work at Taylor Hardin, employed from July, 1989, to March, 1991. At one point in Terrell's employment at Taylor Hardin, she became involved in an affair with Stricklin.
 
 
 51
 Terrell testified that Stricklin treated women differently than men, and responded to males in a more professional way. Stricklin made derogatory jokes about women as a class. Terrell indicated that Stricklin half-kidded, but at the same time was "half-serious, too." Terrell testified that Stricklin described women as less intelligent as men and "cause a lot of trouble, and the facility would be better off with men than women." Terrell indicated that Stricklin had a lot of "underlying anger towards women" because of his previous marriages.
 
 
 52
 One particular woman Stricklin commented to Terrell about was Olive Beaty, director of education at Taylor Hardin. According to Terrell, Stricklin overruled Beaty's plan to educate and assist patients through support groups. Terrell testified that Stricklin told her the reason he overruled it was
 
 
 53
 because he didn't like--well, first of all, there was a general thing with Mr. Stricklin that he just really does not like assertive women, women that really challenge him. And so Miss Beaty asserted herself and fought for this program in an appropriate, professional manner. And he just negated it basically. He just didn't want to hear about it. And when he found out that she disagreed with him, he told me that I'd better shut her up or she wasn't going to be there much longer.
 
 
 54
 When Terrell and Stricklin ended their relationship, Stricklin requested her to voluntarily resign. Terrell indicated that Stricklin's words were, "If you don't leave voluntarily, I will hound you. I will nitpick you in your job until you leave. I have done it before with other women, and I will do it with you. I'm an expert at it, and I have the power because I'm the director." Terrell testified to Horsley's and Poundstone's alleged mistresses, and how they would protect Stricklin's job if Terrell's husband were to seek action against Stricklin.
 
 
 55
 Terrell testified that she did not join in this case because she did not consider it morally right to gain monetarily after getting involved with Stricklin. Terrell testified that Stricklin threatened that if she were to bring a harassment suit, Stricklin "would cause trouble between me and my husband."
 
 Sue Osborne
 
 56
 Sue Osborne was manager of medical records at Taylor Hardin, beginning on April 5, 1986. Osborne testified that Stricklin got within inches of her face while yelling and screaming. Osborne never witnessed Stricklin treat any male employee in this manner.
 
 
 57
 Osborne testified that at one meeting, Stricklin pulled a pistol out of his bottom desk drawer and laid it on the desk with the barrel pointing toward Osborne. Stricklin grinned, patted it, and said, "Now, let's get down to business." Stricklin then put the gun back in the drawer. Osborne testified she "was scared to death." Osborne testified that she did not report this incident to anyone because she had to support her child who had many medical problems, and her mom and dad. Osborne testified that after the gun incident, Stricklin acted as if he "was going to pull [the gun] out and just sort of grinned again."
 
 
 58
 Osborne testified that she met with Poundstone after her resignation in April of 1990, and told him about the gun incident and Stricklin's harassing conduct towards her. Osborne testified that Poundstone told her that "he felt like that Mr. Stricklin would be gone from that facility."
 
 John Donahue
 
 59
 John Donahue was assistant director at Taylor Hardin as of January, 1990. Donahue testified that he worked with Stricklin as assistant director between two and four hours a day. Donahue did not believe Stricklin "treated females subject to disciplinary action more harshly than males," and that Stricklin "would get angry with anyone who failed to meet the performance standards or failed to comply with the policy." Donahue testified that Stricklin "yelled" at him, but never "put his face right up in [Donahue's] face, did not shake his fist" at Donahue, and did not throw anything at Donahue.
 
 
 60
 Donahue testified that York never identified employees who were "being sexually harassed or discriminated against." Donahue acknowledged a microphone in York's work area, but testified that he did not know of any person who listened to any of York's conversations in the control room.
 
 George Atchley
 
 61
 George Atchley worked at Taylor Hardin as a quality assurance coordinator, beginning in December of 1988. Atchley testified that Stricklin raised his voice and pointed his finger at Atchley and other male employees when angry. Atchley testified that he did not witness much difference in Stricklin's treatment of male and female employees other than that Atchley "was always glad when there was a female in the meeting that [he] was in with him because--during those meetings [Stricklin's] temperament was more subdued. [Stricklin] didn't do--he wasn't as free with the way he treated you--." Atchley testified that he resigned after a year and a half as acting assistant facility director, based upon Stricklin's management style.
 
 
 62
 Atchley testified to a meeting he attended with Osborne and Stricklin. At this meeting, Stricklin reached down into his lower desk drawer and pulled out a pistol, set it up on his desk, and stated, "something like, 'okay, now we're going to solve this problem today one way or the other.' And it was--you know, kind of a joking tone." Atchley testified that he was "a little intimidated" and "afraid."
 
 Esther Van Dall
 
 63
 Esther Van Dall worked at Taylor Hardin as coordinator of quality assurance. Dall never witnessed Stricklin treat a female employee differently than a male employee, and never witnessed Stricklin "put down or disparage women as a group."
 
 Beverly Strong
 
 64
 At the time of trial, Beverly Strong worked at the Taylor Hardin facility as community court liaison. Strong testified that Stricklin expressed his anger the same towards male employees as female employees.
 
 Gloria Massey
 
 65
 Gloria Massey worked at Taylor Hardin as a forensic technician supervisor. Massey testified that she did not witness Stricklin treat male employees differently than female employees.
 
 Cathy Gunderson
 
 66
 Cathy Gunderson testified that she inquired about a job at Taylor Hardin. Gunderson testified that Stricklin entered the interview room and stated that management "did not hire females." Gunderson phoned Stricklin about a week later and told him that he was "open for a lawsuit by telling [her] that [he] cannot hire a female in this--in this position, when [she has] just as much qualifications as somebody else?" Gunderson testified that Stricklin responded "he didn't care. That I could go ahead and do what I wanted. That he would win."
 
 
 67
 (3) Testimony specific to wiretap claim
 
 
 68
 Ernest Edgeworth Jr.
 
 
 69
 Ernest Edgeworth was a security officer at Taylor Hardin. Edgeworth testified to a control room where one can listen to microphones that are placed around the facility, and it was "possible to hear voices in Ms. York's office area." Edgeworth knew of no one listening to York's conversations, though he observed Stricklin in the control room listening to transmissions via a microphone in the visitors' area.
 
 Curtis Horn
 
 70
 Curtis Horn worked at Taylor Hardin as a police lieutenant. Horn testified that when York went on sick leave, "all of a sudden we noticed the system (microphone in her area) started back working. When she came back, it was still working." Horn filed a report regarding the microphone.
 
 Randy Anders
 
 71
 Randy Anders worked at Taylor Hardin as a police lieutenant. Anders testified that from the control room, he listened to voices in York's work area via a microphone, and he found a microphone about ten feet from York's desk outside her office.
 
 Barbara Richards
 
 72
 Barbara Richards testified that she worked at Taylor Hardin as communications officer supervisor. Richards testified that no one instructed her to listen in on conversations with York from the control room via microphone from York's work area.
 
 Randy White
 
 73
 Randy White worked at Taylor Hardin as manager of plant technology and safety. White testified that Stricklin instructed him to disconnect the microphone in York's work area. White then instructed Dennis Stanek to disconnect the microphone. White acknowledged that he did not remove the microphone, but merely turned down the volume. White testified that Stanek simply moved the ceiling tile with the microphone incorporated in it and placed another ceiling tile under it. White did not see anyone attempt to monitor conversations from York's work area.
 
 Dennis Stanek
 
 74
 Dennis Stanek worked at Taylor Hardin as a safety officer. Stanek testified that no one instructed him to hide or conceal the microphone in York's work area. Stanek knew placing a plain piece of ceiling tile over and covering up the microphone allowed it to remain potentially active. Stanek knew of no other microphone in the facility that was hidden like the one in York's work area.
 
 PROCEDURAL HISTORY
 
 75
 Appellees, Cross and York, filed this lawsuit on July 8, 1991, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e, et seq. and 42 U.S.C. Sec. 1983, complaining of sexual harassment and a hostile work environment at Taylor Hardin. On September 27, 1991, the district court permitted O'Quinn, Weltin, Stalnacher, Davis and Thacker to intervene as plaintiffs. In January, 1992, York amended her complaint to allege a wiretap claim, pursuant to 18 U.S.C. Sec. 2520 (Supp.1993).
 
 
 76
 The district court dismissed Davis's and Stalnacher's Title VII claims prior to trial, but denied appellants' other motions to dismiss and motions for judgment as a matter of law.
 
 
 77
 The case proceeded to a jury trial on September 18, 1992. The jury returned answers to special interrogatories, finding in favor of appellees, and the court entered final judgment against appellants. The district court permanently enjoined appellants from maintaining a hostile work environment at Taylor Hardin and from otherwise violating Title VII and section 1983 in the terms and conditions of employment of female employees at Taylor Hardin. The district court also permanently enjoined Stricklin and his agents from retaliating against appellees for their participation in this lawsuit, and enjoined Stricklin from violating 18 U.S.C. Sec. 2520. The district court permanently enjoined appellants from failing to reinstate appellees to their former positions at Taylor Hardin or, at appellees' option, to an equivalent position at another state agency.
 
 
 78
 The district court ordered monetary recovery for appellees against Stricklin, Poundstone, and Horsley in their individual and official capacities: (1) for Cross, $25,000 as back pay, $25,000 for emotional distress, and $100,000 as punitive damages; (2) for Stalnacher, $19,000 as back pay, $25,000 for emotional distress, and $100,000 as punitive damages; (3) for O'Quinn, $2,000 as back pay, $25,000 for emotional distress, and $100,000 as punitive damages; (4) for Weltin, $5,000 back pay, $25,000 for emotional distress, and $100,000 as punitive damages; (5) for Thacker, $1,000 as back pay, $25,000 for emotional distress, and $100,000 as punitive damages; (6) for Davis, $21,000 as back pay, $25,000 for emotional distress, and $100,000 as punitive damages; (7) for York, $25,000 for emotional distress, $100,000 as punitive damages, and $20,000 as punitive damages against Stricklin, individually, for the wiretap claim. The court also awarded appellees reasonable attorney's fees and assessed costs against appellants.
 
 
 79
 Upon a motion to amend the final judgment, the court entered judgment against the state of Alabama for amounts of back pay awarded to appellees, other than to Stalnacher and Davis. Thereafter, on October 16, 1992, the district court denied appellants' renewal of their motion for judgment as a matter of law and for new trial.
 
 CONTENTIONS OF THE PARTIES
 
 80
 Appellants contend that the Eleventh Amendment bars appellees' suit against the state of Alabama and Horsley, Poundstone and Stricklin, in their official capacities. Horsley contends that he is entitled to qualified immunity. Horsley also contends that because appellees did not include Horsley, individually, in their Equal Employment Opportunity Commission (EEOC) complaint, they waived the right to bring a Title VII action against him. Appellants contend that the district court misunderstood the legal standard applicable to appellees' claims, misled the jury, erred in not permitting the jury to consider Taylor Hardin's anti-harassment policy, erred in allowing the issues to go to the jury, improperly applied the Civil Rights Act of 1991 retroactively in awarding compensatory and punitive damages, and abused its discretion in not granting their motion for a new trial. Stricklin contends that no evidence supports York's wiretap claim.
 
 
 81
 Appellees contend that substantial evidence supports the jury's findings against all appellants, and that the district court properly ruled on all issues.
 
 ISSUES
 
 82
 This appeal involves the following issues: (1) whether the Eleventh Amendment immunizes appellants from appellees' lawsuit pursuant to section 1983; (2) whether Horsley is entitled to qualified immunity; (3) whether appellees met the conditions precedent for suit against Horsley under Title VII; (4) whether the district court misunderstood the legal standard for hostile work environment; (5) whether the district court properly instructed the jury; (6) whether the evidence is sufficient to support the jury's findings; (7) whether the district court retroactively applied the Civil Rights Act of 1991 in awarding compensatory and punitive damages to appellees; and (8) whether the evidence is sufficient to support York's wiretap claim.
 
 DISCUSSION
 I. Eleventh Amendment Immunity
 
 83
 Appellants argue that the judgment against them pursuant to section 1983 is in violation of the Eleventh Amendment. It is undisputed that the Eleventh Amendment does not bar appellees' Title VII suit. E.g. Allen v. Alabama State Bd. of Educ., 816 F.2d 575, 577 (11th Cir.1987).
 
 
 84
 "The Eleventh Amendment prohibits a federal court from exercising jurisdiction over a lawsuit against a state, except where the state has consented to be sued or waived its immunity, or where Congress has overridden the state's immunity." Lassiter v. Alabama A & M University, 3 F.3d 1482, 1485 (11th Cir.1993). "Congress has not abrogated Eleventh Amendment immunity in section 1983 cases." Carr v. City of Florence, Alabama, 916 F.2d 1521, 1525 (11th Cir.1990). Alabama has not waived its immunity. E.g. Alabama v. Pugh, 438 U.S. 781, 782, 98 S.Ct. 3057, 3057-58, 57 L.Ed.2d 1114 (1978). Thus, the Eleventh Amendment bars appellees' section 1983 suit against the state of Alabama.
 
 
 85
 The Alabama Department of Mental Health and Mental Retardation is a department of the state government. Ala.Code Sec. 22-50-2 (1990). Horsley, in his capacity as commissioner of the Department, and Poundstone, in his capacity as associate commissioner for the mental illness division for the Department, are "state officials." Ala.Code Sec. 22-50-2. Whether Taylor Hardin "is an arm of the state partaking of the state's Eleventh Amendment immunity turns on its function and characteristics as determined by state law." Sessions v. Rusk State Hospital, 648 F.2d 1066, 1069 (5th Cir.1981).[1] The Taylor Hardin Secure Medical Facility is a state institution created by the Department under the authority of the Alabama Legislature. Ala.Code Sec. 22-50-11. Thus, Stricklin, as director of the Taylor Hardin facility, is a state official.
 
 
 86
 The Eleventh Amendment bars appellees' section 1983 lawsuit for monetary damages against Horsley, Poundstone, and Stricklin in their official capacities. "Official capacity actions seeking damages are deemed to be against the entity of which the officer is an agent." Lassiter, 3 F.3d at 1485. In these cases, "the state is considered the real party in interest because an award of damages would be paid by the state." Carr, 916 F.2d at 1524.
 
 
 87
 The appellees' section 1983 lawsuit seeking prospective injunctive relief against Horsley, Poundstone, and Stricklin in their official capacities is not treated as an action against the state, and the "Eleventh Amendment does not insulate official capacity defendants from actions seeking prospective injunctive relief." Lassiter, 3 F.3d at 1485. Appellees' request for reinstatement is not barred by the Eleventh Amendment. Lassiter, 3 F.3d at 1485. Nor does the Eleventh Amendment preclude a damages award against Horsley, Poundstone, and Stricklin in their individual capacities pursuant to section 1983. Wu v. Thomas, 863 F.2d 1543, 1550 (11th Cir.1989).
 
 
 88
 The Eleventh Amendment prohibits appellees' section 1983 action against the state of Alabama, and for money damages against Horsley, Poundstone and Stricklin in their official capacities. To the extent the district court ruled otherwise, we reverse.
 
 II. Qualified Immunity
 
 89
 Horsley, in his individual capacity, argues that qualified immunity protects him from appellees' section 1983 lawsuit. This court in resolving this issue must determine "whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions." Mitchell v. Forsyth, 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985). Horsley is immune from appellees' section 1983 lawsuit unless his actions violated clearly established law. Mitchell, 472 U.S. at 530, 105 S.Ct. at 2817-18. Appellees have the burden of showing that Horsley violated clearly established legal rights. Busby v. City of Orlando, 931 F.2d 764, 773 (11th Cir.1991). An official is immune from liability if applicable law is unclear or a reasonable official "could have believed that his actions were lawful in light of the clearly established law and the information possessed by the officer." Stewart v. Baldwin County Bd. of Education, 908 F.2d 1499, 1504 (11th Cir.1990).
 
 
 90
 The relevant question is whether a reasonable person in Horsley's position as Commissioner could have believed that doing nothing in response to knowledge of a subordinate director's sexual harassment and discrimination and the creation of a hostile work environment at a facility was lawful, in light of clearly established law. E.g. Busby, 931 F.2d at 773. Horsley's subjective beliefs are irrelevant. Busby, 931 F.2d at 773. We conclude that a reasonable person in Horsley's position could not have believed doing nothing in light of Stricklin's conduct was lawful, in light of the clearly established law that sexual harassment and discrimination was an infringement of legal rights.
 
 
 91
 We hold that the district court correctly rejected Horsley's contention that he was entitled to qualified immunity. Horsley, in his individual capacity, is subject to section 1983 liability.
 
 
 92
 III. Whether appellees met "the conditions precedent for suit against Horsley as an individual under Title VII."
 
 
 93
 Horsley argues that appellees' filing of a charge of discrimination against him with the EEOC after the filing of this lawsuit prejudiced his right "to seek resolution of the charge through the conciliation procedures set forth by Congress" at 42 U.S.C. Sec. 2000e-5(f)(1). Horsley contends that the filing of a charge of discrimination with the EEOC is a condition precedent to suit, citing Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982).
 
 
 94
 Appellees filed this lawsuit on July 8, 1991. Appellees filed charges of employment discrimination with the EEOC on July 24, 1991. In appellees' First Amendment To Complaint in this case, attached are two Notice[s] of Right To Sue under Title VII issued by the EEOC and dated September 11, 1991. The notices state that appellees have the right to sue under Title VII, but must bring suit in federal district court within ninety days from the receipt of the notices. The notices state that "[w]ith the issuance of this Notice of Right to Sue, the Commission is terminating any further processing of this charge."
 
 
 95
 Pursuant to 42 U.S.C. Sec. 2000e-5(f)(1), if "a charge filed with the Commission ... is dismissed by the Commission, ... the Commission ... shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge (A) by the person claiming to be aggrieved...." The Notice[s] of Right To Sue gave appellees the immediate right to file suit in federal district court. Appellees filed their First Amendment to Complaint in the district court on September 18, 1991, after the EEOC issued the notices and prior to the expiration of ninety days. Based on the above, Horsley's arguments are without merit.
 
 
 96
 Horsley, in his individual capacity, also contends that he is not an "employer" within the meaning of Title VII. We agree. In Busby we held:
 
 
 97
 Individual capacity suits under Title VII are ... inappropriate. The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act. We think the proper method for a plaintiff to recover under Title VII is by suing the employer, either by naming the supervisory employees as agents of the employer or by naming the employer directly.
 
 
 98
 Busby, 931 F.2d at 772 (citations omitted) (emphasis in original). Therefore, the appellees' Title VII claims are properly rendered against the Department through Horsley, Poundstone, and Stricklin in their official, not individual, capacities. To the extent the district court ruled otherwise, we reverse.
 
 
 99
 IV. Legal standard for hostile work environment
 
 
 100
 Appellants argue that the district court misunderstood the legal standard applicable in a hostile work environment case. Appellants assert that the court believed that "a supervisor's 'management style,' even if it treats male and female employees equally, may nevertheless be considered illegal sexual harassment if it has a different effect on female employees." This assertion derives from the court's questioning of defense witnesses. For example, the court questioned Stricklin on whether Stricklin considered that his "style may have a different effect on [his] female employees than male employees?" Appellants assert that the court's questioning misled the jury into an erroneous understanding of the legal standard.
 
 
 101
 This court in Henson v. City of Dundee, 682 F.2d 897 (11th Cir.1982) set forth the elements necessary to establish sexual harassment that creates a hostile work environment: (1) the employee complainant must belong to a protected group--in this case, the employee must be a woman; (2) the employee must establish that she was subject to unwelcome sexual harassment; (3) the harassment complained of must be based upon gender; and (4) the harassment complained of must have affected the condition of the complainant's employment. Henson, 682 F.2d at 903-04. The district court instructed the jury in accordance with these elements.
 
 
 102
 The district court's questioning of the witnesses complained of went to whether appellants considered whether Stricklin's management style was more offensive to female employees than male employees. This is not an improper line of questioning. See e.g., Henson, 682 F.2d at 904 ("where the conduct complained of is equally offensive to male and female workers.... [t]he sexual harassment would not be based upon sex because men and women are accorded like treatment."). Appellants' argument is without merit.
 
 V. Jury Instructions
 
 103
 Appellants contend that the district court erred in failing to give appellants' requested instructions numbers 22 and 23.[2] They argue that (1) the Department's anti-harassment policy requiring employees to report sexual harassment to management and (2) appellees' failure to utilize the policy are relevant to whether Horsley and Poundstone knew or should have known of the sexual harassment occurring at Taylor Hardin. Appellants contend that the failure to instruct the jury on the relevancy of this evidence misled the jury. Appellants assert that the court's instruction that it "is not necessary in order to prevail on their claims that the plaintiffs must have filed a grievance under agency or facility policies or that they exhausted or completed any administrative remedies which were available to them under state law" further misled the jury and prevented the jury from evaluating relevant evidence in determining employer liability under Title VII.
 
 
 104
 In reviewing the district court's jury instructions, this court will look to see whether the charges, considered as a whole, sufficiently instruct the jury so that the jurors understand the issues involved and are not misled.... Moreover, the trial court's refusal to give a requested instruction is not error where the substance of that proposed instruction was covered by another instruction which was given.... If a requested instruction is refused and is not adequately covered by another instruction, the court will first inquire as to whether the requested instruction is a correct statement of the law.... If the instruction is a correct statement of the law, the court will next look to see whether it deals with an issue which is properly before the jury.... In the event both these standards are met, there still must be a showing of prejudicial harm as a result of the instruction not being given before the judgment will be disturbed.
 
 
 105
 Dempsey v. Mac Towing, Inc., 876 F.2d 1538, 1542 (11th Cir.1989) (quoting Pesaplastic, C.A. v. Cincinnati Milacron Co., 750 F.2d 1516, 1525 (11th Cir.1985)).
 
 
 106
 Appellants cite to and rely upon Meritor Savings Bank v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) as supporting their contention that the anti-harassment policy and appellees' failure to utilize it insulate appellants from liability. In Meritor Savings Bank, the Supreme Court reversed the District of Columbia Circuit's holding that "employers are always automatically liable for sexual harassment by their supervisors" regardless whether the employer "knew nor reasonably could have known of the alleged misconduct." Meritor Savings Bank, 477 U.S. at 72, 106 S.Ct. at 2408. The employer bank argued to the Supreme Court that the employee complainant's failure to use the established grievance procedure insulated the bank from liability for its supervisor's sexual harassment of the complainant. The Supreme Court recognized that the court of appeals's holding made employers absolutely liable "for the acts of their supervisors, regardless of the circumstances of a particular case." Meritor Savings Bank, 477 U.S. at 73, 106 S.Ct. at 2408.
 
 
 107
 The Supreme Court ruled that "absence of notice to an employer does not necessarily insulate that employer from liability," as the bank contended. Meritor Savings Bank, 477 U.S. at 72, 106 S.Ct. at 2408. The Court set forth the United States's and EEOC's assertion that
 
 
 108
 if the employer has an express policy against sexual harassment and has implemented a procedure specifically designed to resolve sexual harassment claims, and if the victim does not take advantage of that procedure, the employer should be shielded from liability absent actual knowledge of the sexually hostile environment.... In all other cases, the employer will be liable if it has actual knowledge of the harassment or if, considering all the facts of the case, the victim in question had no reasonable available avenue for making his or her complaint known to appropriate management officials.
 
 
 109
 Meritor Savings Bank, 477 U.S. at 71, 106 S.Ct. at 2407-08 (quoting Brief for United States and EEOC). The Court declined to issue a "definitive rule on employer liability" based upon the record being insufficient to establish whether the bank's supervisor made sexual advances towards the complainant and whether these advances were "so pervasive and so long continuing ... that the employer must have become conscious of them." Meritor Savings Bank, 477 U.S. at 72, 106 S.Ct. at 2408. Nevertheless, the Court makes clear that in cases where the employer has actual knowledge of the harassment, or the "victim in question" did not have a reasonable avenue for making his or her complaint known to appropriate management officials, the employer is not shielded from liability because the complainant did not give notice of the activity. Meritor Savings Bank, 477 U.S. at 71-72, 106 S.Ct. at 2407-08.
 
 
 110
 Requested jury instruction number 23 instructs the jury that if it finds that the Department had a clear policy against sexual harassment containing an established grievance procedure, and none of the appellees chose to pursue the grievance procedure, then the jury must find for appellants on appellees' claims of sexual harassment under Title VII. Meritor Savings Bank expressly rejects this statement as the law. Meritor Savings Bank, 477 U.S. at 72, 106 S.Ct. at 2408. The district court properly denied giving instruction number 23.
 
 
 111
 Requested jury instruction number 22 states that the jury may take into account "the fact that the Department had a well defined and publicized policy against sexual harassment," and "the fact that none of the plaintiffs made a formal grievance complaint under the Department's regulations." Even if this proposed instruction were correct, appellants fail to show prejudicial harm resulting from the district court's refusal to give it. The jury heard testimony from several appellees admitting that they did not utilize the anti-harassment policy's reporting procedures. Appellants argued to the jury that appellees' failure to so utilize the policy was important for the jury's determination whether appellants knew or should have known of the hostile work environment. It was not necessary for the district court to specifically instruct the jury on one piece of evidence for determining whether appellants knew or should have known.
 
 
 112
 Meritor Savings Bank does not require the trial court to charge the jury that a grievance procedure exists and that plaintiffs failed to utilize the grievance procedure, if such are the facts. Meritor Savings Bank merely acknowledges that the jury may consider these alleged facts in determining employer liability. Meritor Savings Bank, 477 U.S. at 72, 106 S.Ct. at 2408. The district court need not instruct the jury on each and every piece of evidence. Appellants' argument is without merit.
 
 VI. Sufficiency of the evidence
 
 113
 Appellants argue that the evidence is insufficient to establish liability. We disagree and hold (1) that the district court and jury's findings are not clearly erroneous, and (2) that the findings are based upon evidence sufficient to impose liability against the Department pursuant to Title VII, and against Horsley, Poundstone, and Stricklin in their individual capacities pursuant to section 1983.
 
 
 114
 (1) Title VII
 
 
 115
 Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. Sec. 2000e-2(a)(1) (1981). The Act defines the term "employer" as a "person engaged in an industry affecting commerce ... and any agent of such a person." 42 U.S.C. Sec. 2000e(b) (1981). "When the work place is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." Harris v. Forklift Systems, Inc., --- U.S. ----, ----, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (citations omitted).
 
 
 116
 A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their ... gender ... offends Title VII's broad rule of work place equality.
 
 
 117
 Harris, --- U.S. at ---- - ----, 114 S.Ct. at 370-71. Appellees presented sufficient evidence for the finding that Stricklin discriminated against them because of their gender, and that such discrimination created "a work environment abusive" for female employees.
 
 
 118
 As to Horsley and Poundstone, the law requires appellees to establish that Horsley and Poundstone knew or should have known of the harassment and failed to take prompt action to remedy the violation. "The employee can show that the employer had knowledge of the harassment by proving that she complained to higher management of the problem or by demonstrating that the harassment was so pervasive that an inference of constructive knowledge arises." Huddleston v. Roger Dean Chevrolet, Inc., 845 F.2d 900, 904 (11th Cir.1988). Here, also, appellees presented sufficient evidence for the finding that Horsley and Poundstone knew or should have known of Stricklin's discriminatory treatment of female employees, yet failed to take prompt action to remedy the hostile work environment Stricklin's conduct created. Appellants fail to undermine the nearly overwhelming record evidence that Horsley and Poundstone knew or should have known of Stricklin's discriminatory treatment of female employees.
 
 
 119
 We also conclude that the evidence is sufficient to support the finding that Cross, Stalnacher, O'Quinn, Weltin, and Thacker "involuntarily resign[ed] in order to escape intolerable and illegal employment requirements" Stricklin created through sexual harassment of them. E.g. Henson, 682 F.2d at 907.
 
 
 120
 In sum, appellees presented sufficient evidence to support Title VII liability against the Department.
 
 
 121
 (2) Section 1983
 
 
 122
 Appellees also alleged a violation of their equal protection rights under the United States Constitution pursuant to 42 U.S.C. Sec. 1983, based upon Stricklin's sexual harassment. Appellees have a constitutional right to be free from unlawful sex discrimination and sexual harassment in public employment. E.g. Davis v. Passman, 442 U.S. 228, 235, 99 S.Ct. 2264, 2271, 60 L.Ed.2d 846 (1979).
 
 
 123
 In order to establish a violation of the Equal Protection Clause, appellees must prove discriminatory motive or purpose. Whiting v. Jackson State University, 616 F.2d 116, 122 (5th Cir.1980). The court in Whiting held that "such intent should be inferred in the same manner as [the Supreme Court] said it is inferred under [42 U.S.C. Sec. 2000e-5]." Whiting, 616 F.2d at 121. "When section 1983 is used as a parallel remedy for violation of section 703 of Title VII [42 U.S.C. Sec. 2000e-2], the elements of the two causes of action are the same." Hardin v. Stynchcomb, 691 F.2d 1364, 1369 n. 16 (11th Cir.1982) (citing Whiting, 616 F.2d at 123). We hold that appellees presented sufficient evidence to substantiate their section 1983 equal protection claim, and Stricklin failed to present evidence sufficient to convince the finder of fact that his motives were non-gender related.
 
 
 124
 As to Horsley and Poundstone, liability under section 1983
 
 
 125
 must be based on something more than a theory of respondeat superior. Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation. The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.
 
 
 126
 Brown v. Crawford, 906 F.2d 667, 671 (11th Cir.1990) (citations omitted), cert. denied, 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991). Stricklin discriminated against female employees and created a hostile work environment. Stricklin's conduct was "obvious, flagrant, rampant, and of continued duration." Brown, 906 F.2d at 671. We hold that the record supports the finding that Horsley and Poundstone were on notice of the need to correct Stricklin's discrimination of female employees, and yet failed to do so. The record is sufficient to support section 1983 liability against Horsley and Poundstone.
 
 
 127
 VII. Retroactive application of the Civil Rights Act of 1991
 
 
 128
 Appellants contend that to the extent the district court awarded compensatory and punitive damages to appellees pursuant to Title VII, this court must reverse based upon the lower court's erroneous retroactive application of the Civil Rights Act of 1991. Because two cases were pending before the Supreme Court on this issue, we waited for the Supreme Court rulings. The Court held that the Civil Rights Act of 1991 does not apply to cases that arose before its enactment. Landgraf v. USI Film Products, --- U.S. ----, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); Rivers v. Roadway Express, --- U.S. ----, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994). Accordingly, the district court is reversed for applying the 1991 Civil Rights Act retroactively. Appellants are correct that circuit precedent mandates that the Civil Rights Act of 1991 is not to be applied retroactively, and that Title VII prior to the 1991 amendments did not allow compensatory and/or punitive damages. E.g. Goldsmith v. City of Atmore, 996 F.2d 1155, 1159 (11th Cir.1993). Thus, as to any compensatory or punitive damage awards against the state of Alabama or Horsley, Poundstone, and Stricklin in their official capacity, we reverse such awards. Nevertheless, the district court's award of compensatory and punitive damages to appellees remains as against Horsley, Poundstone, and Stricklin in their individual capacities pursuant to section 1983. E.g. Walker v. Ford Motor Co., 684 F.2d 1355, 1363 n. 13 (11th Cir.1982).
 
 VIII. Evidence concerning the wiretap claim
 
 129
 Stricklin argues that no evidence supports the jury's verdict concerning York's wiretap claim, pursuant to 18 U.S.C. Sec. 2520. Section 2520 provides, in pertinent part, that "any person whose wire, oral, or electronic communication is intercepted ... may in a civil action recover from the person or entity which engaged in that violation such relief as may be appropriate." 18 U.S.C. Sec. 2520(a). Such relief includes punitive damages and reasonable attorney's fees. 18 U.S.C. Sec. 2520(b).
 
 
 130
 Three elements are necessary for York to prevail on her section 2520 wiretap claim. She must prove that (1) Stricklin intercepted her oral communications, (2) York had an expectation that her oral communications were not subject to interception, and (3) York's expectation was justified under the circumstances. Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir.1990).
 
 
 131
 This court held in Scutieri v. Paige, 808 F.2d 785, 790 (11th Cir.1987), that circumstantial evidence may establish a section 2520 claim. E.g. Walker, 911 F.2d at 1578. We hold that York presented sufficient evidence for the jury to determine that Stricklin violated York's rights under section 2520. Stricklin's argument is without merit. We reject all other contentions and arguments that appellants present.
 
 CONCLUSION
 
 132
 In summary, we reverse the district court's final judgment against appellants insofar as (1) the judgment is against the state of Alabama pursuant to section 1983, (2) the award of monetary damages is against Horsley, Poundstone, and Stricklin in their official capacities pursuant to section 1983, (3) the awards of back pay are against Horsley, Poundstone, and Stricklin in their individual capacities pursuant to Title VII, and (4) compensatory and punitive damages are awarded under a retroactive application of the Civil Rights Act of 1991. In all other respects, we affirm the district court's final judgment. Thus, appellants are permanently enjoined as expressed in the district court's final judgment. The Department is liable for the awards of back pay. Horsley, Poundstone, and Stricklin in their individual capacities are liable for damages for emotional distress and mental anguish, and punitive damages, pursuant to section 1983. Stricklin remains liable for punitive damages imposed pursuant to 18 U.S.C. Sec. 2520.[3]
 
 
 133
 REVERSED in part, AFFIRMED in part.
 
 
 
 [1]
 In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit rendered prior to October 1, 1981
 
 
 [2]
 Defendants' Requested Jury Instruction No. 22
 In considering whether Stricklin's superiors knew or should have known of the alleged sexual harassment, you may take into account the fact that the Department had a well defined and publicized policy against sexual harassment as well as a grievance procedure in place for reporting incidents of sexual harassment directly to the office of the associate commissioner or the commissioner. You may also take into account the fact that none of the plaintiffs made a formal grievance complaint under the department's regulations.
 Defendants' Requested Jury Instruction No. 23
 If you find that the Alabama State Department of Mental Health and Mental Retardation had a clear and express policy against sexual harassment, which policy was conveyed to each of the plaintiffs, and that the Department had an established grievance procedure which none of the plaintiffs chose to pursue, then you must find for defendants on plaintiffs' claim of sexual harassment under Title VII.
 Meritor Bank, 477 U.S. at 71, 73, 106 S.Ct. at 2407, 2408.
 
 
 [3]
 The Petition for Rehearing and the Suggestion for Rehearing En Banc are denied