**Julius MORGAN, Plaintiff,**

v.

**STATE OF ALABAMA, Alabama Department of Transportation, and Jimmy Butts, Transportation Director, Defendants.**

Civil Action No. 96–D–1239–N.

United States District Court,
M.D. Alabama,
Northern Division.

March 18, 1998.

Ann K. Wiggins, Robert L. Wiggins, Stanley W. Logan, Kell A. Simon, Birmingham, AL, C. Paige Williams, Energen Corp., Birmingham, AL, for Plaintiff.

Thomas R. Elliott, Jr., Allen R. Trippeer, Jr., Lisa Wright Borden, C. Dennis Hughes, Stephen L. Scott, Birmingham, AL, for Defendants.

## MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the Court is the Defendants' Motion For Summary Judgment filed July 25, 1997. A Brief In Support Of Summary Judgment ("Defs.' Br.") was filed on the same date. Plaintiff filed his Memorandum In Opposition ("Pl.'s Opp'n") on September 8, 1997, along with evidentiary Submissions ("Pl.'s Evid."). On December 30, 1997, Plaintiff filed the expert report of Dr. Edwin L. Bradley ("Bradley Report"). After a careful and thorough review of the arguments of counsel, relevant law, and the record as a whole, the court finds that Defendants' Motion For Summary Judgment is due to be denied.

### JURISDICTION

The court properly exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question); 1343 (civil rights). The parties do not contest personal jurisdiction or venue.

### SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is ne genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50,

106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989).

The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions in the file, together with affidavits, if any,'" that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his or her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *see also* Fed.R.Civ.P. 56(e).

In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(c); *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348; *see also Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

## DISCUSSION

### I. FACTUAL SUMMARY

Plaintiff Julius Morgan is a black citizen of the United States and a resident of the State of Alabama who was employed by the State of Alabama's Department of Transportation ("Department") in its Fourth Division, headquartered in Alexander City, Alabama. Morgan was first employed in 1986 as a seasonal laborer for the Department. He worked for three to four months and was then laid-off. In May of 1989 he was again hired as a seasonal laborer, although he had applied for a job bearing the classification "Highway Maintenance Technician I" ("HMT I"). The duties of a seasonal laborer are as follows: "Employee will pick up litter; cut bushes; mow grass and prune shrubs and trees within the division." (*See* Defs.' Br., Ex. A, Morgan Dep., Defs.' Ex. 1.) In January of 1990, Morgan was converted from a temporary to a full-time employee and his job classification changed from seasonal laborer to laborer. His duties as a laborer are as follows: "Employee will cut grass, clean out pipes and culverts, patch pavement, and perform other Maintenance duties." (*See* Defs.' Br., Ex. A, Morgan Dep., Defs.' Ex. 3.) His supervisor was Charles Lee Harris, a white male, who was the Division–Wide Maintenance Superintendent.

In 1992, Morgan was subpoenaed to testify at the trial of *Reynolds, et al. v. State of Alabama, et al.,* CV–85–T–665–N (M.D.Ala.) (Thompson, J.), a class action employment discrimination suit against the Alabama Department of Transportation. Plaintiff contends that when he presented the subpoena to his supervisor, Harris, he was told that he was "making a mistake by testifying at the trial." (Pl.'s Evidence, Ex. C., Morgan Aff. at 2.) At trial, Morgan testified regarding the conditions under which he and other black laborers worked, as well as provided anecdotal testimony regarding the discriminatory impact of the Department's job classification and selection system. Specifically, Plaintiff describes his testimony as addressing, among other issues, the following:

1. The treatment of African–American laborers and HMTs working in the 4th Division, and specifically working for Charles Lee Harris;

2. That his supervisor, Harris, required African–American employees to work on his private farm, as well as other personal work that was charged to the state ...;

3. That Harris created a hostile work environment towards African–American employees by making them do the dirtiest work and by using racial epithets and other demeaning language and conduct. This portion of his testimony ap-

peared in an article in the *Montgomery Advertiser* and other newspapers....
His supervisor, Charles Harris, was aware of his testimony....;

4. That he performed the same work as higher classifications but that he was not compensated for this work....

Morgan's testimony was part of the plaintiff class' proof that the defendants, AL-DOT and State Personnel Department (hereinafter "SPD"), had engaged in a pattern and practice of race discrimination. Morgan's supervisors were provided a copy of his subpoena and were fully aware that he was participating in the *Reynolds* trial on behalf of the plaintiff class.

(*See* Pl.'s Opp'n at 3.) Plaintiff contends that:

A few days after my testimony, I was walking in the hallway near the division maintenance offices when I overheard the maintenance engineer, Mr. Al Lipscomb, state in a loud voice referring to me that "twenty years ago I would have killed a nigger for running his mouth like he did." Mr. Lipscomb is white.

(Pl.'s Evidence, Ex. C., Morgan Aff. at 3.) Plaintiff contends that prior to testifying in *Reynolds*, he had no known performance problems and that as of June 1992, his supervisors were fully satisfied with his performance. (*Id.* at 3.)

In May of 1994, pursuant to "Consent Decree I" entered in *Reynolds*,[1] Morgan was moved to an HMT–I position. "Task Statements" for the HMT–I position include the following:

A. Cuts vegetation such as grass, bushes, and trees, using equipment and tools such as lawn mowers, bush hogs, bush axes, swing blades, chain saws, weed eaters, edgers, and chippers following oral instructions such as supervisory directives in order to increase visibility and enhance appearance.

B. Spread chemicals and materials such as herbicides, fertilizer, grass seed, liquid asphalt, mulch, paint, water, air, and sandblasting materials using materials, tools, and equipment such as water, drift control, air compressor, truck, hand sprayer, hydro seeder, sandblasting machine, water pump, and wind gauge, following oral and written instructions such as Standard operating Procedures from State Vegetation Manual and supervisory directives in order to maintain vegetation; clean bridges; prevent erosion, and prepare for road resurfacing and painting.

C. Directs traffic in areas of highway construction, maintenance and survey work using safety equipment and materials such as vests, hard hats, caution flags, warning signs, arrow boards, traffic cones, and barrels following oral and written instructions such as supervisory directives and OSHA Standards in order to prevent accidents and injuries to motorists and co-workers.

D. operates equipment such as cranes, drill rigs, fork lifts, boats, push barges, front end loaders, motor graders, bulldozers, asphalt spreaders, drill presses, paving breakers, chain saws, hydraulic jacks, tractors, mowers, machine shop equipment, and dump trucks following oral instructions such as supervisory directives in order to drive pilings; obtain testing material samples; repair shoulders; clean out drain pipes; lift bridges; remove telephone poles; cut ditches; facilitate destruction of beaver dams; lift heavy loads; clean wreck sites; remove and replace pavement markers; transport equipment; cut grass; install sign posts; mix concrete; fireproof bridges; lay pipe; and perform demolition work.

E. Picks up and removes hazardous debris, dead animals, logs, trees, litter, and tree parts, using equipment and tools such as dump trucks, shovels, rubber boots, gloves, front end loaders, wench trucks, and cranes following oral instructions such as supervisory directives in order to prevent accidents and improve highway safety, visibility, and appearance.

---

1. Plaintiff identifies Consent Decree I as document number 552/553 in the *Reynolds* action—CV 85–T–665–N (M.D.Ala.) (Thompson, J.). (*See* Pl.'s Opp'n at 2.) Consent Decree I was entered March 16, 1994. (*See* Pl.'s Evid., Ex. H.)

(*See* Defs.' Br., Ex. A, Morgan Dep., Defs.' Ex. 23.)

Plaintiff's employment was marked by a series of on-the-job injuries and mishaps. In April of 1990, he injured his right shoulder and received "severe bruises" when the State vehicle he was driving was struck from behind by an "eighteen wheeler." (*Id.*, Ex. 13.) Plaintiff testified in his deposition that he couldn't recall if during 1990 "there was anything required of [his] job that [he] could not do." (*Id.* at 69–70.)[2] In July of 1991, while riding in the back seat of a State vehicle, Morgan was struck in the right shoulder by a "curb and gutter form." (*Id.*, Ex. 14.) Although first stating in his deposition that he could not recall if he had any job restrictions associated with this injury, (*id.* at 73), Morgan later stated that he did. (*id.* at 75–76; *see also infra* n. 2.) Morgan incurred medical bills and missed time from work as the result of each injury. (*Id.* at 70–72.) The Department paid all of his bills, and paid him for his missed time. (*Id.*) He has no complaints about the way the Department handled his 1990 and 1991 injuries and thinks that he was treated fairly. (*Id.* at 72–73.)

Despite adequate resolution of the costs associated with his injuries, Plaintiff does contend that:

> Before I testified [in *Reynolds* ] my supervisors had worked with me to accommodate my doctors' orders in finding work which would not aggravate my injury. After my testimony my supervisor Charles Lee gave me work which he knew placed me in danger of reinjuring my shoulder. Mr. Harris was very angry about my trial testimony and told me that he was going to "work me or fire me" because of my testimony about him at the in *Reynolds* trial [sic]. He told me that he had asked to have me removed from his crew because he did not want me working for him because of my testimony. I objected to being transferred because I knew that there was work on the division crew which could accommo-

date my injury and I had gained skills which I wanted to continue to use. Despite my objections I was transferred to the herbicide crew in 1992 and later to the First District. I informed the department that I felt that both transfers were retaliatory. After my transfer to the herbicide crew I contacted the *Reynolds* plaintiff class counsel and complained. I was subsequently put back on the division wide crew. This seemed to increase Mr. Harris animosity [sic] even more. Documents began to be placed in my file and I was reprimanded for things which had never been a cause for concern in the past and for which my fellow employees were not reprimanded. I was given work assignments that my supervisors knew were dangerous or demanding and that they knew would be difficult for me. I was subjected to scrutiny to which my co-workers were not subjected.

(Pl.'s Evidence, Ex. C., Morgan Aff. at 4.)

In May of 1993, while using a pick to clear space for a gutter form, Morgan struck a rock and injured his right shoulder. (*Id.*, Ex. 16.) He stated in his deposition that at the time, he was on work restrictions involving a "weight limit" and the use of certain tools. (*Id.* at 82–83.) Morgan testified that he knew he was not supposed to be using the pick, but felt that he was "told to do a job. If I had refused, they were ready to write me up." (*Id.* at 84.) In September of 1994, Morgan was pulling and cutting tree limbs to be mulched. While doing so, he pulled or dislocated a muscle in his right shoulder. (*Id.*, Ex. 15.) At the time, Morgan was working under work restrictions as a result of his previous injuries. (*Id.* at 75.) His supervisors, Leon Morris and Robert Camp, and some of members of the work crew he was assigned to, knew that he had work restrictions. (*Id.* at 75–76.) In fact, one of the members of the work crew offered to "pull limbs because he knew the situation with my shoulder, but Willie Mitch-

---

2. Plaintiff contends that "[a]fter the accident, Morgan's physician placed him on restrictions, which eventually were that he could not lift more than 25 lbs. Morgan Dep., p. 83." (Pl.'s Opp'n at 4.) A review of pages 70 to 85 of Morgan's deposition discloses, however, that it is not clear when the 25 lb. lifting restriction was imposed. In fact, page 75 of Morgan's deposition indicates that the restriction was imposed following a 1991 injury. (*See* Defs.' Br., Ex. A, Morgan Dep. at 70–85.)

ell said he had instructions for me to pull and cut limbs. And that is how I reinjured my shoulder, pulling limbs." (*Id.* at 75.) Morgan underwent surgery on his injured shoulder in October of 1994 and returned to work the next month. Finally, in April of 1995, Morgan was picking up litter and was bitten by a spider on his left leg. Although the Department initially refused to cover Morgan's surgery resulting from the 1994 injury, the Department eventually covered Morgan's medical costs, and has paid all benefits Morgan was due for each injury he has suffered.

Morgan was also the subject of reprimands or incident reports during his employment with the Department. In April of 1992, he was instructed to shovel dirt/gravel from a culvert and he refused. Morgan contends that he refused because the culvert was filled with water, and at that time, he had a "weight restriction" on the work he could perform because of his previous on-the-job injuries. (*Id.* at 25–26.) Defendants contend that Morgan was then told to "flag" the rest of the day, and he refused. (*Id.* at 27–29; Ex. 5.) Morgan stated the he could not recall whether he refused to flag the rest of the day. (*Id.* at 27, 29.) The next day, the Defendants told Morgan that he would "flag" for the day, but Morgan stated that he had leave time and the he would take the day off before he would flag. (*Id.*, Ex. 5.) Morgan contends that "[i]t was put to me you are going to flag or you can go home. So I said I will go home, because of the way he (Charles Harris) had put it to me." (*Id.* at 28.) All of this was put into a report by A.H. Lipscomb, Assistant Division Engineer for the Department's Fourth Division, which was placed in Morgan's file.

On August 24, 1992, a meeting was held to discuss the status of Morgans' driver's license. Morgan had received a letter that as of September 4, 1992, his license would be suspended for failure to pay a traffic ticket. Morgan was told that he was not to operate State vehicles and that he should take steps to resolve the matter and provide the Department with documentation reflecting the reinstatement of his driving privileges. (*Id.*, Ex. 7.)

On October 2, 1992, Morgan failed to appear for work, and failed to notify his supervisor that he would not be at work. He contended that his wife telephoned the Department, but he could not identify the person that his wife spoke with. This absence was the subject of an October 5, 1992 memorandum from Charles Harris, the Division Wide Superintendent to A.H. Lipscomb, the Assistant Division Engineer. (*Id.*, Ex. 8.)

In April of 1993, a work crew was performing concrete maintenance work which involved the pouring of concrete. (*Id.*, Ex. 11.) Job requirements dictated that the work crew leave the Division Office at 5:00 A.M. to allow for a concrete setting period of five hours before allowing traffic back onto the highway. (*Id.*) Charles Harris requested that the crew report to work at 5:00 A.M. because of these requirements, but Morgan stated that he could not report to work that early because his car was broken down. (*Id.*) This incident was the subject of another letter from Charles Harris to A.H. Lipscomb, this one dated April 9, 1993. On the same date, Lipscomb wrote a letter to Morgan that stated in pertinent part:

> This is to advise you that it is your responsibility to report to your work area with other members of the crew at the assigned time. Effective this date, April 9, 1993, failure to report to your work area at the assigned time without prior approval from your supervisor will result in leave without pay for that day. Excessive days of leave without pay due to this will lead to more severe disciplinary action.

(*Id.*, Ex. 12.)

Plaintiff was next disciplined in August of 1994, when he was suspended for one week without pay "due to irresponsible behavior during the period of July 11, 1994 through August 1, 1994." (*Id.*, Ex. 20.) An August 5, 1994 letter from Miles H. Ward, Assistant Division Engineer to F.L. Blankenship, Division Engineer recommended the suspension and described the Morgan's behavior as including:

> reporting to work late, numerous erroneous reporting of work activities, leaving assigned work area without reporting to supervisor, not reporting to work area as-

signed by supervisor, driving State vehicle without a drivers license, failure to report activities to supervisor, and failure to perform work assigned by supervisor. (*Id.*, Ex. 20.) Morgan contends that:

My suspension followed a typical pattern of retaliation after I or my attorney made a complaint about my treatment at the department. In June, 1994 my attorney wrote the department complaining that I was improperly classified under the consent decree.... Approximately three weeks later the department alleged that I had engaged in a serious [sic] of infraction [sic] occurring on a few days in July, 1994 which required suspension. I was not guilty of any of theses [sic] infractions prior to my suspension. No one approached me on the days that these infractions occurred and counseled me for any misconduct. I asked for the opportunity to dispute the allegations but my request was denied.

(Pl.'s Evidence, Ex. C., Morgan Aff. at 5.)

Upon returning to work on August 29, 1994, Morgan was transferred to "District One from Division Wide." (*Id.* at 113.) His supervisor was no longer Charles Harris, but upon his transfer, Morgan fell under the supervision of Leon Morris, Willie Mitchell and, ultimately, Robert Camp. (*Id.* at 118–119.) Morgan contends that Camp "was fully aware of Mr. Harris' animosity towards me after my testimony in *Reynolds*." (Pl.'s Evidence, Ex. C., Morgan Aff. at 5.)

Sometime after this transfer, a telephonic conference took place between Morgan, Robert Camp, his new supervisor, and Morgan's doctor, a Dr. Howorth. The purpose of the conference was to determine Morgan's work capabilities in light of his injuries. The parties to the conversation utilized the "Task Statements" outlined above, and concluded that essentially, Morgan was restricted from engaging in activities that required effort over his "weight limit" or that could have aggravated his shoulder injury. (*Id.* at 127–34; *see also, Id.*, Ex. 23.)

Three days after beginning work in District One, in early September of 1994, Morgan suffered the shoulder injury described above. (*Id.*, Ex. 15.) Despite the conversation with Morgan and his doctors, Morgan contends that:

On September 1, 1994, Mr. Camp told my supervisor, Willie Mitchell, in my presence, that he wanted him to work "the hell out of me." This was said about no other person assigned to the maintenance crew. I was assigned to work on a crew of six men. Two of the men were performing flagging duties and the other four men were assigned. Despite my shoulder injury I was assigned to pull and cut tree limbs. One of the men who was flagging offered to trade assignments with me because he was aware of my shoulder injury but Mr. Mitchell said there could be no change because Mr. Camp had instructed him that I was to pull and cut limbs. I severely reinjured my right shoulder doing this task when my arm was caught and hooked by a limb.

(Pl.'s Evidence, Ex. C., Morgan Aff. at 6.)

Because of this injury, as noted above, Morgan had shoulder surgery in October of 1994. When he returned to work in early November, he was assigned to pick up trash. Morgan contends that:

Mr. Camp assigned me to pick up trash on the side of the road even though there were many other duties which I could have performed that would not have been so demeaning. A white HMT who had a permanent injury, Edward Salter, was given light duty work and was never treated in the demeaning or harmful manner that I was. I objected to being the only person in the District I to be required to walk behind the mowers picking up trash everyday. None of my co-workers were given this assignment on a regular basis. In fact, since my discharge this assignment had been given to convicts. Mr. Camp made no effort to rotate me into the better HMT I assignments such as crewleader or equipment operator, even though he was required to under the consent decree.

(Pl.'s Evidence, Ex. C., Morgan Aff. at 6.)

As part of his recovery, Morgan was required to attend physical therapy. Morgan started attending physical therapy and doctor's visits in the mornings. Morgan's morn-

ing visits made it difficult for Camp to assign Morgan to work crews that left in the morning and returned at the end of the work day. Accordingly, in January of 1995, with Morgan's approval, Camp arranged for Morgan's appointments to be changed to approximately 3:30 P.M. so that Morgan could work a larger portion of the work day. (*Id.*, at 124–25, 135.) Morgan testified that he had no objection to the change and that he understood Camp's reasoning for wanting to make the change. (*Id.* at 125.) Defendants contend that Morgan then unilaterally changed the appointments back to the mornings. (Defs.' Br. at 5; *see also* Ex. B., Camp Aff., ¶ 5.)

Morgan contends, however, that:

After my injury and return to surgery in November, 1994, Robert Camp's harassment of me increased. He changed my doctors' appointment, he continued to give me demeaning work assignments or refused to accommodate my injury. Willie Mitchell, my crew leader, told me that Mr. Camp instructed him to keep a day to day diary on my activities. He told me that he was not told to keep a diary on other employees. In December, 1994, I reported my concerns about the harassing treatment to my attorney who wrote a letter to the department's lawyer.... I also called the EEO monitor for the *Reynolds* case, Mr. Ron Green, to report the harassment. Mr. Green did nothing. I talked to Lewis Blankenship, the division EEO officer about my mistreatment. He did nothing. In January 1995, my immediate supervisor, Leon Morris, told me that the treatment I was receiving was not because of him but from the "division". He told me that he had nothing to do with the fact that I was being given assignments that other people were not given. He told me that he was just doing what he was told. At no time that I worked for Mr. Morris from August, 1994 to June 1995 did he reprimand me for my work performance, absenteeism or any other violation of work rules. Mr. Morris was the person who was most familiar with my work other than my co-workers.

(Pl.'s Evidence, Ex. C., Morgan Aff. at 8.)

Morgan also contends that:

Mr. Camp kept a close eye on where I went and was particularly suspicious if he saw me go to the division office. Ouida Maxwell, a named plaintiff in *Reynolds,* worked in the Fourth Division office. Mr. Camp made a specific point of telling me that I was not allowed to go to the division building without his permission, where as before my testimony no such restriction had ever been placed on me. On one occasion Robert Camp wrongly accused me of walking around in the division office. My crew leader Robert Shaw told me that he knew this was untrue since I had been working outside with him. Mr. Shaw told Mr. Camp he was wrong but Robert Camp refused to believe him. This happened approximately one week before I was fired. Prior to the *Reynolds* trial there was a long distance phone line to Montgomery in the maintenance crew office. After the trial I had used it on several occasions to call Ron Green, the EEO monitor. Shortly thereafter, the phone line was removed, thus, effectively denying me and other black employees ready access to make complaints. My co-workers blamed me for the loss of the phone.

(Pl.'s Evidence, Ex. C., Morgan Aff. at 7.)

Later in January of 1995, the presiding Judge in the *Reynolds* action—the Honorable Myron H. Thompson—ordered that a revised grievance procedure be implemented pursuant to Consent Decree I. On February 28, 1995, Morgan filed a grievance alleging harassment by Charles Harris, Alfred Lipscomb, Robert Camp and Mike Mallory. (*Id.,* Ex. 25.) Morgan detailed a list of incidents from July of 1994 through February 27, 1995 in support of his contentions. (*Id.*) Morgan did not attend a scheduled grievance hearing because "[a]fter consulting with my attorneys I elected not to go forward with the grievance but to file a formal charge with the EEOC since my prior internal complaints had not been resolved in an unbiased manner." (Pl.'s Evidence, Ex. C., Morgan Aff. at 8–9.) Morgan contends that his decision was also based on the fact that:

on May 15, 1994, I was called to see Lewis Blankenship, the Fourth Division EEO officer. When I walked up to his office Mr.

Blankenship did not see me but I overheard him tell to d'vision employees that "they were finally getting they [sic] opportunity to send that s.o.b. home." One of the other employees asked who and he said "Julius Morgan ... this is a red letter day." I walked in and asked Lewis if he was talking about me. He was very startled and he mumbled something about coffee. I told Mr. Camp about this when I told him I was not attending the grievance hearing. One week later I was fired.

(Pl.'s Evidence, Ex. C., Morgan Aff. at 9.)

On May 15, 1995, Defendants contend that Morgan reported to work and informed his supervisor, Leon Morris, that "his doctor had changed his medication and he would no longer be able to work in the sun." (*Id.*, Ex. B., Camp Aff., ¶ 6.) A meeting between Morgan, his supervisor Robert Camp, and EEOC Coordinator Lewis Blankenship was held regarding Morgan's claim. Morgan's doctor was called, and, according to Camp, stated that he did not tell Morgan that he should not work in the sun. (*Id.*) In his deposition, Morgan denied that the incident occurred and denied telling anyone in the Department that he was on medication that prevented him from working in the sun. (*Id.*, Ex. A., Morgan Dep. at 159–60.)

On May 23, 1995, Morgan was assigned to a mowing crew and instructed to pick up litter. (*Id.* at 157–58.) He refused to do so because he felt it was discriminatory. (*Id.* at 158.) On May 22, 1995, the day before this incident, his supervisor, Robert Camp, sent a letter regarding Morgan to the Division Engineer F.L. Blankenship. In pertinent part, the letter reads:

Since August 1994, Mr. Morgan has continued to be absent from work, not followed department procedures, provided false information concerning his doctor's requests to his supervisor, and he has refused to perform assigned tasks. He has also failed to report on time for meetings which he had initiated causing the loss of time and effort.

In light of this I believe that it is in the best interest of the department and I recommend that Mr. Morgan be dismissed

from employment from the Department of Transportation.

(*Id.*, Ex. 27.) On June 9, 1995, Morgan was discharged from his employment.

Morgan contends that:

I had never been given any prior notice of these accusations and had never been reprimanded for any of the alleged infractions. Every time that I was out of work, at the doctor or physical therapy Mr. Camp was aware of the reason and knew that I had approval. I violated no known work rule when I went to doctors' appointments, physical therapy and jury duty. If I am guilty of missing work days there are employees who did not oppose discrimination who missed work who were never disciplined. Dusty Morgan, a white HMT, was regularly tardy and absent and was never discharged. Mr. Camp never presented me with a reprimand regarding my absences nor did he give me an opportunity to work with him in a manner which would have been satisfactory to all involved. All of the allegations in the termination letter were extremely vague. To this day I do not know the underlying factual basis for these allegations. Neither Mr. Camp, Freddie Blankenship or Lewis Blankenship would or could provide me with the facts supporting the allegations. I did not commit any offenses alleged in the termination letter I received on May 23, 1995.

(Pl.'s Evidence, Ex. C., Morgan Aff. at 5.)

This suit was filed August 9, 1996. Plaintiff contends that:

[p]rior to 1991, [he] had a solid work record and performance. In fact, his supervisors were pleased with his work, moreover, Morgan had often served as a crew leader, a defacto supervisory position where, he supervised higher classified employees.... However, after (he) testified at the *Reynolds* trial, his treatment drastically changed. Where before the trial, his personnel file did not contain write-ups or memos regarding performance, after he testified, memos were often placed in [his] personnel file without his knowledge.... After [he] testified at the Reynolds trial, he began to experience retaliation in the form of unfair disciplines, unfair job as-

signments, various threats and eventually termination from his supervisors, Charles Harris, Robert Camp, Freddie Blankenship, Al Lipscomb, and Miles Ward. (Pl.'s Opp'n at 3–4.) Essentially, Plaintiff's argument is that as a result of his testimony in *Reynolds*:

he was harassed and retaliated against in the form of, inter alia, unfair discipline, retaliatory work assignments, unfair evaluations, discharge and other terms and conditions of employment.

(Pl.'s Compl. at 3, ¶ 6.) He also asserts that he was retaliated against in violation of Consent Decree I entered in *Reynolds*, and that "the violation of the Consent Decree and his grievances subject thereto are also a part of this complaint."[3] (*Id.*, ¶ 8.)

Plaintiff seeks a declaratory judgment that Defendants' employment policies and practices violate Plaintiff's rights secured by Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. §§ 1981 and 1983. Plaintiff also seeks "an Order requiring the defendants to make the plaintiff whole by awarding him the position(s) he would have had [sic] occupied in the absence of race discrimination, retaliation and racial harassment, back-pay (plus interest), lost compensatory damages, punitive damages, seniority, benefits, and lost pension." (*Id.* at 4, ¶ 3.) Finally, Plaintiff "prays for such other relief and benefits as the cause of justice may require, including, but not limited to, compensatory and punitive damages, an award of costs, attorney's fees and expenses." (*Id.*, ¶ 4.)

## II. APPLICABLE LAW AND ANALYSIS

As noted, Morgan brings claims under Title VII, § 1981, § 1983, and alleges violations of *Reynolds'* Consent Decree I. Defendants Motion For Summary Judgment, however, is limited to the following assertions: (1) that Defendants enjoy immunity under the Eleventh Amendment against Plaintiff's § 1983 claim for monetary damages; (2) that summary judgment should be granted on all claims against Defendant Butts in his official capacity; and (3) that summary judgment should be granted on the merits of Morgan's Title VII retaliation claim. At the pretrial hearing of this matter on March 13, 1998, the Parties conceded that their pleadings were less than thorough. Plaintiff's pleadings do not adequately clarify the exact nature of Plaintiff's claims and Defendants' Motion For Summary Judgment fails to address all the grounds for the dismissal of Plaintiff's claims that Defendants wish to assert.[4] Because of these deficiencies, the Parties agreed that even after the issuance of this Memorandum Opinion and Order, the exact matters left for trial are somewhat unclear.

As an initial matter, the court notes that it is reluctant to allow the piecemeal litigation of this action. The court's Uniform Scheduling Order, with its guidance for the conduct of discovery and deadlines for the filing of dispositive motions, among other provisions, provides for a timely and orderly method of narrowing the factual and legal issues for both the pretrial hearing, and, ultimately, the trial. Both Parties have been aware of the requirements and deadlines of the court's scheduling order for a substantial period of time. Plaintiff failed to clearly articulate his causes of action in his Complaint and subsequent pleadings. The Defendants failed to seek clarification of the exact nature of Plaintiff's claims or assert all of their viable grounds for summary judgment in their Motion For Summary Judgment, and now seek to insert new issues into the action. Although reluctant to do so, the court will allow the Defendants to raise issues not timely raised in conjunction with their motions in limine to be filed prior to trial. To give the court adequate time to consider these issues, however, the court will modify its previous

---

3. Among other things, Consent Decree I required the State Personnel Board to develop and validate new tests and qualifications for certain job classifications, and ordered the implementation of a revised grievance procedure.

4. For example, at the pretrial hearing, Defendants raised—for the first time—the argument that Plaintiff was barred from asserting any claims arising under Consent Decree I, and that this action should be limited solely to Plaintiff's Title VII retaliation claim for any alleged discrimination stemming from his testimony in *Reynolds*.

scheduling order and set a briefing schedule to address these deficiencies.[5]

The remainder of this Memorandum Opinion And Order addresses the issues raised in Defendants' Motion For Summary Judgment outlined above.

A. The Eleventh Amendment Bars Any Claims For Damages Under 42 U.S.C. § 1983

▪ The Alabama Department of Transportation is a Department of the State Government of Alabama. Ala.Code § 23–1–20 (1975). Butts, in his capacity as Director of the Department is an agent of the state and a "state official." *See* Ala.Code § 23–1–21 (1975); *Cross v. State of Alabama, State Department of Mental Health & Mental Retardation*, 49 F.3d 1490, 1502–03 (11th Cir. 1995). "Official capacity actions seeking damages are deemed to be against the entity of which the officer is an agent." *Lassiter v. Alabama A & M University*, 3 F.3d 1482, 1485 (11th Cir.1993) (citations omitted). In an official capacity action, "the state is considered the real party in interest because an award of damages would be paid by the state." *Carr v. City of Florence, Alabama*, 916 F.2d 1521, 1525 (11th Cir.1990). Accordingly, the Eleventh Amendment[6] bars Morgan's § 1983 claim for monetary damages against Butts in his official capacity. Therefore, the court finds that Defendants' Motion For Summary Judgment on Plaintiff's § 1983 claim for monetary damages against Defendant Butts in his official capacity is due to be granted. *See also Cross*, 49 F.3d at 1503; *Wu v. Thomas*, 863 F.2d 1543, 1549–50 (11th Cir.1989), *reh'g and reh'g en banc denied* March 8, 1989.

Despite prohibiting § 1983 claims for monetary damages against individuals in their official capacities, "[the] Eleventh Amendment does not insulate official capacity defendants from actions seeking prospective injunctive relief." *Lassiter*, 3 F.3d at 1485; *see also Wu*, 863 F.2d at 1550 ("The eleventh amendment does not … bar suits for equitable relief against state officers in their official capacity. …"). In *Cross*, the Eleventh Circuit specifically noted that the Eleventh Amendment barred § 1983 suits for monetary damages against individuals in their official capacities while at the same time allowed for § 1983 suits seeking injunctive relief against individuals in their official capacities. *See Cross*, 49 F.3d at 1503. Accordingly, to the extent Defendants seek summary judgment on Plaintiff's claims for equitable relief under § 1983, the court finds that the motion is due to be denied.

B. Defendants Are Entitled To Summary Judgment On All Of Plaintiff's Title VII Claims Asserted Against Defendant Butts

As a matter of law, state officials sued in their official capacities cannot be held personally liable under Title VII. *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir.1996) (noting that there is no individual responsibility under Title VII); *Smith v. Lomax*, 45 F.3d 402, 403 n. 4 (11th Cir.1995) (same); *Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056, 1060 (11th Cir.1992) ("Title VII actions are not appropriately brought against government officials in their personal capacities")

In *Busby v. City of Orlando*, the Eleventh Circuit noted that:

Individual capacity suits under the relief granted under Title VII is against the *employer*, not individual employees whose actions would constitute a violation of the Act. … We think the proper method for a plaintiff to recover under Title VII is by suing the employer, either by naming the supervisory employees as agents of the

---

5. The court will set a briefing schedule at the conclusion of this Memorandum Opinion and Order.

6. The Eleventh Amendment provides that:
   The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
   U.S. Const. amend. XI.

employer or by naming the employer directly.[7]

931 F.2d 764, 772 (11th Cir.1991) (per curiam);

█ Plaintiff admits that like his § 1983 claim, Eleventh Circuit precedent precludes a Title VII claim for monetary damages against Defendant Butts in his official capacity. (Pl.'s Opp'n at 21.) Plaintiff contends, however, that also like Plaintiff's § 1983 claim, Defendant Butts should remain in this action because "individual prospective injunctive relief under Title VII ... is appropriate." (Id. at 21–22.) Plaintiff has failed to offer any support for this assertion. And, given the Eleventh Circuit's consistent holdings that individual capacity Title VII suits brought against state officials are inappropriate because the relief granted under Title VII is against the employer, the court finds that Defendants' Motion For Summary Judgment on all of Plaintiff's Title VII claims against Defendant Butts in his individual capacity is due to be granted. The court will reconsider this particular ruling should Plaintiff offer case-law on point that distinguishes between claims for monetary damages and requests for injunctive relief against state officials in their individual capacities.

### C. Defendants' Motion For Summary Judgment On Plaintiff's Title VII Retaliation Claims Is Due To Be Denied

█ Under Title VII, it is an unlawful employment practice for an employer to discriminate against an employee "because he [or she] opposed any practice made an unlawful employment practice by this subchapter, or because he [or she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). "To recover for retaliation, the plaintiff 'need not prove the underlying claim of discrimination which led to her [or his] protest,' so long as she [or he] had a reasonable good faith belief that the discrimination existed." Meeks v. Computer Associates Int'l, 15 F.3d 1013, 1021 (11th Cir.1994) (quoting Tipton v. Canadian Imperial Bank

of Commerce, 872 F.2d 1491, 1494 (11th Cir. 1989)).

█ As with a discriminatory treatment claim, a plaintiff alleging a retaliation claim under Title VII must begin by establishing a prima facie case. See, e.g. Little v. United Technologies, Carrier Transicold Division, 103 F.3d 956, 959 (11th Cir.1997). The plaintiff must show that: (1) he or she engaged in statutorily protected activity; (2) that he or she suffered an adverse employment action; and (3) that there is some causal relation between the two events. Meeks, 15 F.3d at 1021 (citing EEOC v. Reichhold Chemicals, Inc., 988 F.2d 1564, 1571–72 (11th Cir.1993); Weaver v. Casa Gallardo, Inc., 922 F.2d 1515, 1524 (11th Cir.1991); Tipton, 872 F.2d at 1494)). Courts are to "interpret 'the causal link requirement broadly; a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" Meeks, 15 F.3d at 1021 (citing Reichhold Chemicals, 988 F.2d at 1571–72 (citing Simmons v. Camden County Bd. of Educ., 757 F.2d 1187, 1189 (11th Cir.), cert. denied, 474 U.S. 981, 106 S.Ct. 385, 88 L.Ed.2d 338 (1985))).

█ Once the plaintiff has established a prima facie case, "the employer must proffer a legitimate, non-discriminatory reason for the adverse employment action. As with a Title VII discrimination claim, the employer's burden is 'exceedingly light.'" Meeks, 15 F.3d at 1021 (citing Tipton, 872 F.2d at 1495). The plaintiff must then establish that the employer's proffered reasons are pretextual; "'the burden of production shifts, but the burden of persuasion remains with the plaintiff.'" Id. (citing Reichhold Chemicals, 988 F.2d at 1572).

█ Plaintiff not only testified in the Reynolds trial in 1992, but has subsequently complained of discrimination and retaliatory conduct to superiors. Accordingly, the court finds that Plaintiff has satisfied the first prong of his prima facie case (engaged in statutorily protected activity). Plaintiff has also satisfied the second prong of his prima

---

**7.** In the action at bar, Plaintiff named the State of Alabama, the Alabama Department of Transportation, and its Director, Jimmy Butts as De-fendants. Defendant Butts was not named as an "agent" of the Department, but was named directly.

facie case; Plaintiff was disciplined and reprimanded and ultimately discharged after his testimony in *Reynolds,* and after filing complaints of discrimination (suffered an adverse employment action). The Parties' main dispute, predictably, centers on whether there is a causal connection between the two. After reviewing the evidence before the court in a light most favorable to the Plaintiff—the non-moving party, *see Adickes,* 398 U.S. at 157, 90 S.Ct. 1598, and keeping in mind the Eleventh Circuit's instruction in *Meeks* to "interpret 'the causal link requirement broadly,'" *Meeks,* 15 F.3d at 1021, the court finds that a reasonable jury could find a causal link between Plaintiff's statutorily protected activity and the adverse employment actions taken against him by the Defendants. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

It is undisputed that Morgan's supervisors were aware of his subpoena to testify in *Reynolds,* that he was a member of the *Reynolds* plaintiffs class, that he testified at the *Reynolds* trial, and the specifics of his testimony. Morgan contends that he was told not to testify in *Reynolds* and that after his testimony, Charles Harris and Robert Camp, among others, expressed their displeasure with his participation in *Reynolds.* It is clear from a review of Harris' deposition that he does not like Morgan. It is also clear from a review of the record that after his *Reynolds* testimony, Morgan was transferred around the Department—requiring intervention by his attorney—and that he was assigned jobs that either singled him out, such as being the only member of a work crew assigned to pick up trash, or that he was assigned jobs in direct contravention of his doctor-mandated work restrictions. Although the Department asserts that it had legitimate non-discriminatory reasons for Morgan's job assignments—his job description encompassed such work (Defs.' Br. at 11), or they were merely trying to accommodate Morgan's injuries (*Id.* at 10)—merely because an employee's job description provides for certain duties does not mean that the assignment of such duties is not discriminatory.

█ Here, for example, Morgan admits that picking up trash was one of the many requirements of his job. However, he also contends that he was the only employee out of a large work crew to be assigned to the job. If an employee can show that he or she was assigned unpopular or menial assignments within the context of his or her job description, such a showing may be sufficient to raise the inference that an employer's proffered legitimate non-discriminatory reason was pretextual or, in this case, retaliatory. A showing of such unpopular or menial assignments will support Plaintiff's pretext argument; the extent of such unpopular or menial assignments will determine the weight to be given such evidence by the trier of fact. Further, while Defendants contend they were merely trying to accommodate Morgan's injuries, Morgan has offered evidence that his supervisors required him to do work they knew to be in violation of his work restrictions.

It is also undisputed that all but one of the Department's "problems" with the Plaintiff came after his June 1992 testimony in the *Reynolds* action. Plaintiff worked for the Department since 1986, and became a full-time employee in 1989. At various times up until 1992, when he testified in *Reynolds,* Morgan had served as a crew leader, a defacto supervisory position. Subsequent to his *Reynolds* testimony, however, he was not given any such assignments. Further, with one exception, his record was devoid of any disciplinary reports prior to his *Reynolds* testimony. Morgan testified in June of 1992. He received a disciplinary report in April of 1992. Although the Defendants contend that Morgan's supervisor Harris could not have had a retaliatory motive in disciplining Morgan in April, two months before his June testimony, (Defs.' Br. at 13), the April incident occurred when all Parties involved were aware of the *Reynolds* action and when Morgan's supervisors were aware of his participation in *Reynolds.* Indeed, Morgan contends that he was told that his participation in *Reynolds* would be a mistake. The April 1992 disciplinary action was sufficiently close to his June 1992 testimony, and occurred within the context of the charged atmosphere that existed in the Department at that time because of the *Reynolds* action, that the court cannot say as a matter of law that

Morgan's April 1992 discipline was solely because of his job performance and was completely unrelated to his participation in *Reynolds*. Nevertheless, even if it was completely unrelated to his participation in *Reynolds*, Plaintiff has proffered sufficient post-testimony conduct by the Defendants that a reasonable jury could construe as retaliatory.

 Subsequent to his testimony, it is clear that Morgan began to run into problems with his supervisors. Although the Defendants contend that all of these problems were solely the result of Morgan's insubordination and disruptive behavior, the court cannot say, as a matter of law, that there was no causal link between the increased focus on Morgan and his *Reynolds* testimony. The court finds that from the evidence outlined above, and a thorough review of the record, Plaintiff has established his prima facie case, and that he has offered evidence supporting his argument that the Department's proffered legitimate non-discriminatory reasons for its actions against Morgan were pretextual. A reasonable jury could find a causal link between Morgan's participation in *Reynolds* and his treatment by the Department and his supervisors. The vast majority of the evidence comes down to a "swearing match," and will entail an analysis of the credibility of various witnesses. In this type of action, such an analysis is not the province of the court, but rather of the trier of fact—here the jury.

For the reasons discussed above, the court finds that Defendants' Motion For Summary Judgment on Plaintiff's Title VII retaliation claim is due to be denied.

## III. CONCLUSION AND ORDER

Based on the foregoing, it is CONSIDERED and ORDERED that Defendants' Motion For Summary Judgment be and the same is hereby GRANTED IN PART AND DENIED IN PART. Defendants' Motion is GRANTED as to Plaintiff's § 1983 claim for monetary damages and GRANTED as to all of Plaintiff's Title VII claims against Defendant Butts in his individual capacity. Otherwise, Defendants' Motion is DENIED.

It is further CONSIDERED and ORDERED that on or before March 24, 1998, the Plaintiff shall file a pleading clarifying the scope of his claims. The Defendants shall thereafter file a Response with *all* of their arguments not previously timely raised in their Motion For Summary Judgment. Such pleading shall be filed no later than April 6, 1998 and shall also include *all* of Defendants' motions in limine. If desired, Plaintiff may file a Reply to Defendants' Response addressing any arguments Defendants raise therein, as well as a response to Defendants' motions in limine. Such pleading shall be filed on or before April 16, 1998. In crafting these pleadings, the Parties are advised to review Judge Thompson's February 27, 1998 Order in *Jessie Lorenzo Smith v. State of Alabama, et al.*, 996 F.Supp. 1203 (M.D.Ala.1998) (Thompson, J.), as well as any other opinions or orders that may impact the court's resolution of the issues raised in this suit.